UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

JONATHAN WICKERS,
        Plaintiff,


        v.                                    CIVIL ACTION NO.
                                              07-12235-MBB

PAUL GOUIN, Assistant Deputy Superintendent;
JERRY ROBITO, Head of Security Essex County;
ANTHONY MURPHY, Lt. Essex County Jail; JERRY
ENOS, Lt. Essex County Jail; EDWARD HARRINGTON,
Lt. Essex County Jail; MICHAEL RICHARDS, Correctional
Officer Essex County; M.J. McNEIL, Correctional
Officer Essex County; PAUL ATKINSON, Correctional
Officer Essex County; and JOHN and JANE DOES
One through 20,
        Defendants.

**MEMORANDUM AND ORDER RE:**
**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
**(DOCKET ENTRY # 68)**

**March 3, 2011**

**BOWLER, U.S.M.J.**

        Pending before this court is a motion for summary judgment

(Docket Entry # 68) filed by defendants Paul Gouin ("Gouin"),

Jerry Robito ("Robito"), Anthony Murphy ("Murphy"), Jerry Enos

("Enos"), Edward Harrington ("Harrington"), Michael Richards

("Richards"), M.J. McNeil ("McNeil"), Paul Atkinson ("Atkinson")

and John and Jane Does One through 20 ("Does") (collectively:

"defendants") pursuant to Rule 56, Fed. R. Civ. P.[1]

--------

        [1] On October 1, 2010, by agreement of the parties in open
court, Frank G. Cousins, Jr., Jason Steiner, Scott B. Sullivan
and Michael O'Brien were dismissed from the case. (Docket Entry
# 68).

Plaintiff Jonathon Wickers ("plaintiff") filed a pro se complaint[2] on November 29, 2007, alleging two causes of action against all defendants for violations of his federal constitutional rights arising from an altercation with correctional officers during his confinement at the Essex County Jail in Middleton, Massachusetts. The first cause of action alleges that all defendants engaged in a conspiracy to violate his civil rights in contravention of section 1983 ("conspiracy claim"). (Docket Entry # 1, ¶ 31). The second cause of action alleges that all defendants violated plaintiff's Eighth Amendment right to be free from cruel and unusual punishment ("Eighth Amendment claim"). (Docket Entry # 1, ¶ 32).

Defendants move for summary judgment on both causes of action. (Docket Entry ## 68 & 69). Represented by counsel, the opposition to summary judgment presents the second cause of action as brought only against Murphy, Enos, Harrington, Richards, McNeil and Atkinson. (Docket Entry # 72, § V, ¶ A). Put another way, although plaintiff presents facts that conceivably implicate Gouin and Robito in a conspiracy (Docket Entry # 72, § III, ¶¶ 20 & 21), plaintiff does not argue their liability under the Eighth Amendment claim for the altercation

---

[2] Plaintiff is now represented by counsel, who filed appearances on January 29, 2009. (Docket Entry ## 27 & 28).

(Docket Entry # 72, § V, ¶ A).[3]

On November 1, 2010, this court conducted a hearing and took the motion for summary judgment (Docket Entry # 68) under advisement.

## STANDARD OF REVIEW

Summary judgment is designed "to pierce the boilerplate of the pleadings and assay the parties proof in order to determine whether trial is actually required." Davila v. Corporacion De Puerto Rico Para La Difusion Publica, 498 F.3d 9, 12 (1st Cir. 2007) (citation and internal quotation marks omitted). Summary judgment is appropriate when the record shows "there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law." Rule 56(c), Fed. R. Civ. P. "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." American Steel Erectors, Inc. v. Local Union No. 7, International Association of Bridge, Structural, Ornamental & Reinforcing Iron Workers, 536 F.3d 68, 75 (1st Cir.

---

[3] The pro se complaint may set out other claims. For example, plaintiff alleges a conspiracy under 18 U.S.C. §§ 241 and 242 ("sections 241 and 242"). Sections 241 and 242 are criminal statutes and do not provide a civil remedy. See Bray v. Alexandria Women's Health Clinic, 506 U.S. 263, 335 (1993). If plaintiff understandably wishes to proceed only on the two causes of action briefed and addressed in the summary judgment filing, it may behoove plaintiff to file a motion for leave to amend to clarify this reasonable position.

3

2008). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Id.

"The moving party bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact." DeNovellis v. Shalala, 124 F.3d 298, 306 (1st Cir. 1997) (citation, internal brackets and internal quotation marks omitted). "After such a showing, the burden shifts to the nonmoving party, with respect to each issue on which he has the burden of proof, to demonstrate that a trier of fact reasonably could find in his favor." Hinchey v. Nynex Corporation, 144 F.3d 134, 140 (1st Cir. 1998) (citation and internal quotation marks omitted).

The nonmoving party, who bears the ultimate burden of proof, may not rest on allegations in his briefs, Borshow Hospital & Medical v. Cesar Castillo, 96 F.3d 10, 14 (1st Cir. 1996), "but must affirmatively point to specific facts that demonstrate the existence of an authentic dispute." McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995). The court must examine the facts in a light most favorable to the non-moving party and resolve any reasonable inferences in that party's favor. Dasey v. Anderson, 304 F.3d 148, 153 (1st Cir. 2002). Viewing the summary judgment facts in plaintiff's favor, they

4

show the following.

STATEMENT OF FACTS

On July 21, 2005, plaintiff was incarcerated at the Essex County Jail in Middleton, Massachusetts. (Docket Entry # 72, Ex. 4, ¶ 15).[4] At approximately 9:00 a.m. plaintiff was involved in a physical altercation with another inmate named Matthew Jones ("Jones"). (Docket Entry # 72, Ex. 4, ¶ 15). Essex County Correctional Officer ("CO") Amy Triantafilou ("Triantafilou") attempted to intervene by grabbing plaintiff from behind. (Docket Entry # 72, Ex. 1). Believing that he was being attacked by one of Jones' friends, plaintiff spun around and struck Triantafilou knocking her to the floor.[5] (Docket Entry # 72, Ex. 1). Triantafilou then restrained and handcuffed plaintiff, during which plaintiff apologized for knocking Triantafilou to the ground. (Docket Entry # 72, Ex. 1).

After the altercation, at approximately 9:30 a.m. plaintiff

---

[4] In the event a complaint is verified, it is appropriate to consider factual averments based on personal knowledge therein as the equivalent of an affidavit for purposes of summary judgment. Sheinkopf v. Stone, 927 F.2d 1259, 1262-1263 (1st Cir. 1991).

[5] The parties dispute the manner in which Triantafilou was knocked to the ground. Plaintiff claims that he "defended himself by pushing the person off his back" and that he was unaware that it was Triantafilou. (Docket Entry # 72, Ex. 1). Defendants claim that plaintiff intentionally assaulted her. (Docket Entry # 69, Ex. C).

was placed in a restraint chair by unnamed officers. (Docket Entry # 72, Ex. 1). Plaintiff remained in the chair for approximately four hours, the maximum time allowed for an inmate to be restrained. (Docket Entry # 72, Ex. 1). While in the restraint chair a nurse is required to examine the inmate every 15 minutes to check circulation. (Docket Entry # 72, Ex. 1). It was during one of these examinations that plaintiff complained to Nurse Debbie Goodwin Potter ("Nurse Goodwin") that his shoulder had been dislocated during the altercation. (Docket Entry # 72, Ex. 1). Plaintiff was uncuffed in order for Nurse Goodwin to reset his shoulder. (Docket Entry # 72, Ex. 1). At Nurse Goodwin's request, plaintiff was re-cuffed with his arms in front of his body rather than behind his back as they had been previously in order to minimize any discomfort caused by the dislocation. (Docket Entry # 72, Ex. 1). Other than the dislocated shoulder, plaintiff reported no other injuries at that time. (Docket Entry # 72, Ex. 1).

At approximately 12:30 p.m., Lieutenants Murphy, Enos, and Harrington and CO's Richardson and Atkinson (collectively: "the officers") arrived to take plaintiff back to his cell. (Docket Entry # 72, Ex. 1). During his deposition, plaintiff testified that the number of officers who participated was "unusual" stating that, "they usually have one or two guys take you out of the chair, and they walk you to your cell, and you're all set,"

and, "I've never seen three Lieutenants like take you out of the
restraint chair." (Docket Entry # 72, Ex. 1). According to
plaintiff, he was then wheeled in the restraint chair to cell
121, an empty cell, as opposed to his own.[6] (Docket Entry # 72,
Ex. 1; Docket Entry # 69, Ex. C). When asked by plaintiff why he
was being put in a different cell, Enos responded, "Amy
[Triantafilou] is not doing well." (Docket Entry # 72, Ex. 1).
Plaintiff was then unstrapped from the chair, though still in
shackles and handcuffs, and told by the officers to walk to the
back of the cell. (Docket Entry # 72, Ex. 1).

    According to plaintiff, as he walked into the cell with his
hands above his head as instructed, Murphy suddenly grabbed him
from behind by his shirt and forcefully thrust plaintiff against
the back wall of the cell. (Docket Entry # 72, Ex. 1).
Plaintiff's head and face were "smashed" against the metal mesh
screen covering the window, opening up a large gash on his
forehead. (Docket Entry # 72, Ex. 1). As this was happening,
Murphy repeatedly ordered plaintiff to stop resisting, despite
plaintiff's insistence that he was not. (Docket Entry # 72, Ex.
1). The officers then took plaintiff to the ground, causing him
to strike his head against the cement floor. (Docket Entry # 72,
Ex. 1). At this point, plaintiff submits, "they all started

_____

    [6]  Murphy, however, wrote in his disciplinary report that
plaintiff was taken to cell 120, which was his customary cell.
(Docket Entry # 69, Ex. C).

beating me up." (Docket Entry # 72, Ex. 1). As described by plaintiff, Murphy sat on plaintiff's back, punching both sides of his face and head and occasionally striking plaintiff's head against the cement floor. (Docket Entry # 72, Ex. 1). At some point, Murphy stopped to ask the plaintiff, "You like to beat women, huh?" before continuing the assault. (Docket Entry # 72, Ex. 1). The other officers punched and kicked plaintiff's legs and body throughout the assault. (Docket Entry # 72, Ex. 1).

Although he was still handcuffed, plaintiff initially attempted to block some of the punches to his head with his hands. (Docket Entry # 72, Ex. 1). In response, Murphy instructed the other officers to assist him in uncuffing plaintiff and re-cuffing him with his hands behind his back. (Docket Entry # 72, Ex. 1). The officers then continued to beat plaintiff who was now unable to block any of the blows to his head. (Docket Entry # 72, Ex. 1). At some point, Enos told the other officers that plaintiff had had enough and he was placed back into the restraint chair. (Docket Entry # 72, Ex. 1). The officers then wheeled plaintiff to the shower room to clean him up, stopping to place a spit hood, a device used to prevent unruly inmates from spitting at prison officials, over plaintiff's head. Plaintiff states he was spitting blood out of his mouth to keep from choking. (Docket Entry # 72, Ex. 1).

Plaintiff's account of the incident is backed by the

deposition testimony of Elijah Jahkur ("Jahkur"), another inmate. (Docket Entry # 72, Ex. 3). Jahkur did not witness the alleged attack but did overhear it from his nearby cell.[7] (Docket Entry # 72, Ex. 3). Jahkur testified that at the time of the incident while in his cell he heard banging and yelling and that his cell mate stated, "they sound like they're beating someone up a couple cells down." (Docket Entry # 72, Ex. 3). Jahkur testified that he talked to plaintiff "all the time" and that even though he could not actually see plaintiff, he recognized the cries coming from the cell as plaintiff's. (Docket Entry # 72, Ex. 3). According to Jahkur, plaintiff kept repeating, "Please, man, leave me alone, man. I have no beef with you all, man. Come on man." (Docket Entry # 72, Ex. 3). Jahkur further testified that plaintiff was "literally crying like a baby." (Docket Entry # 72, Ex. 3). Jahkur claimed that the beating lasted "ten minutes exactly on the dime." (Docket Entry # 72, Ex. 3).

Jahkur testified that following the incident plaintiff was wheeled past his cell and Jahkur identified Harrington, Murphy, Enos, McNeil and Richards[8] exiting the cell all wearing black

---

[7] Jahkur resided in cell 125 just a few cells away from cell 121, the cell in which plaintiff was allegedly assaulted. (Docket Entry # 72, Ex. 3).

[8] At his deposition, Jahkur did not mention Richards but rather a "Richardson." Both plaintiff and defendants testified that Richards was present during the incident. It can therefore be inferred that the officer identified by Jahkur as "Richardson" is in fact Richards.

gloves.[9]  (Docket Entry # 72, Ex. 3).  Jahkur noted plaintiff's appearance as plaintiff passed by his cell:  "[H]is whole face was covered with blood . . . like somebody took a whole bottle of ketchup and just dumped it all over his bald head."  (Docket Entry # 72, Ex. 3).

Defendants' account of the incident, beginning at the time when plaintiff was wheeled to his cell, differs greatly from plaintiff's and Jahkur's account.  Murphy described the events in a disciplinary report ("Murphy's report") written immediately after the incident.  (Docket Entry # 69, Ex. C).  According to Murphy's report, after being unstrapped from the restraint chair, plaintiff was instructed to place his hands above his head and walk slowly to the back of the cell.  (Docket Entry # 69, Ex. C).  Plaintiff was placed against the back wall of the cell.  (Docket Entry # 69, Ex. C).  Murphy then explained to plaintiff that the officers were going to remove his cuffs one by one and that after being uncuffed he was to place his hands on his head.  (Docket Entry # 69, Ex. C).  At his deposition, Atkinson testified that, at this point "One hand was released . . . [h]e tried to pull away or grab the keys . . . [h]e was told not to resist or he would be put back in the chair . . . [h]e kept trying to jar away."  (Docket Entry # 69, Ex. D).  During his deposition,

_____

[9]  Jahkur does not specifically mention CO Atkinson in his deposition as being present at the alleged beating, however, Atkinson is identified by plaintiff as one of his attackers.

Harrington similarly testified that, "During the removal of his handcuff, he, again, made another jerk motion to like turn around or something -- some type of a move to try to break control." (Docket Entry # 69, Ex. E). After continued commands to stop resisting, plaintiff was taken to the floor by the officers and restrained. (Docket Entry # 69, Ex. C). In the process, plaintiff hit his head on the window and floor. (Docket Entry # 69, Ex. C).

While still on the floor, Murphy told plaintiff that plaintiff would once again be uncuffed and then strip searched. (Docket Entry # 69, Ex. C). Plaintiff was warned that if he continued to resist, he would be placed back in the restraint chair. (Docket Entry # 69, Ex. C). Once one handcuff was removed, plaintiff again attempted to pull the keys from Murphy's hands and to pull away. (Docket Entry # 69, Ex. C). Murphy and Richards then forcefully placed plaintiff's hands behind his back and re-cuffed him. (Docket Entry # 69, Ex. C). At this point, plaintiff reportedly made several threatening statements including that, "he was going to stab [the officers] the first chance he got," and "someone is going to take a bullet on the street and that he is putting the word out on [the officers]." (Docket Entry # 69, Ex. C). Plaintiff was placed back in the restraint chair and Nurse Goodwin and Deputy Gouin were notified of the incident. (Docket Entry # 69, Ex. C). While plaintiff

11

was being wheeled to the showers, he began spitting at staff members and a spit hood was applied.  (Docket Entry # 69, Ex. C).

At approximately 12:45 p.m., Nurse Goodwin arrived at the shower room to examine plaintiff's injuries.  (Docket Entry # 72, Ex. 2).  At her deposition, Nurse Goodwin testified about plaintiff's appearance when she first saw him, stating:  "it was just so brutal when I came around and looked at him, what had happened to him."  (Docket Entry # 72, Ex. 2).  She noted that plaintiff "observed to have greater than two centimeter superficial split on top middle of forehead," and a "two centimeters split on skin at . . . left elbow joint."  (Docket Entry # 72, Ex. 2).  Plaintiff also had bruising and swelling around his left eye and abrasions on the left side of his face as well as a footprint on the side of his face and was covered in blood.  (Docket Entry # 72, Ex. 2).  Nurse Goodwin further testified that plaintiff had been calm throughout the morning, but now was "crying in pain, and he was just a wreck mentally and physically."  (Docket Entry # 72, Ex. 2).

Plaintiff was immediately taken to the infirmary for treatment.  (Docket Entry # 72, Ex. 1).  Upon entering the infirmary, plaintiff encountered Robito, who said to plaintiff, "One of mine for one of you's."  (Docket Entry # 72, Ex. 1).  While plaintiff was being treated for his injuries, Gouin told plaintiff, "while you were receiving your beating I was wondering

12

if you would have survived it, as I was laughing this is a good one, I was glad you survived I would have regretted doing the paper-work."  (Docket Entry # 72, Ex. 4, ¶ 15).[10]  Gouin then began patting the officers on the back, stating, "good one." (Docket Entry # 72, Ex. 4, ¶ 15).  Plaintiff remained in the infirmary for approximately three to four hours before being taken back to his unit where he was placed in a cell.  (Docket Entry # 72, Ex. 1).


DISCUSSION

I.  Eighth Amendment Claim

As previously explained, the complaint sets out an Eighth Amendment claim against the individual officers involved in the alleged beating as well as Gouin and Robito.

A.  Murphy, Enos, Harrington, Richards and Atkinson

A plaintiff may recover damages from a state official who, while acting under color of state law, commits a constitutional violation.  42 U.S.C. § 1983.  In order to prevail on a section 1983 claim, the plaintiff must prove two elements:  1) "that the defendant has deprived him of a right secured by the Constitution and laws of the United States"; and 2) that the defendant deprived plaintiff of his constitutional rights while acting under "color of state law."  Adickes v. S.H. Kress & Co., 398

―――――――――――――――――

[10]  See footnote four.

U.S. 144, 150 (1970) (internal quotation marks omitted).

It is settled law that both the treatment of prisoners and the conditions of their confinement are subject to scrutiny under the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 832 (1994). "In its prohibition of cruel and unusual punishment, the Eighth Amendment places restraints on prison officials, who may not, for example, use excessive force against prisoners." Farmer, 511 U.S. at 832. (internal quotation marks omitted). Here, plaintiff alleges the use of excessive and unnecessary force. (Docket Entry # 1). Plaintiff claims defendants used excessive force in violation of the Eighth Amendment during the altercation on July 21, 2005. (Docket Entry # 1).

The proper standard for evaluating such claims is set out by the Supreme Court in Hudson v. McMillian: "[W]henever prison officials stand accused of using excessive and unnecessary force in violation of the Cruel and Unusual Punishment Clause, the core judicial inquiry is . . . whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Hudson v. McMillian, 503 U.S. 1, 6-7 (1992); accord Skinner v. Cunningham, 430 F.3d 483, 488 (1st Cir. 2005). Not every "malevolent touch" by a prison official affronts the Cruel and Unusual Punishment Clause and conduct involving "de minimus force" does not constitute a violation of the Eighth Amendment. Hudson, 503 U.S. at 9-10; see

<u>Skinner</u>, 430 F.3d at 488-489 (injuries sustained by the plaintiff
during three forceful cell extractions resulting from the
plaintiff's refusal to exit cell on his own accord deemed not
inflicted "maliciously or sadistically for the purpose of causing
harm"); <u>Berube v. Conley</u>, 506 F.3d 79, 83-86 (1st Cir. 2007) ("the
defendants' conduct was reasonable and not excessive" where
police officer shot plaintiff several times after he charged the
officer with "a shining object," later found to be a hammer, and
again when two other officers shot the plaintiff on the ground
because, having heard the gunshots and seeing him holding "a
metallic object," believed him to be armed); <u>cf.</u> <u>Davis v. Rennie</u>,
264 F.3d 86, 94 (1st Cir. 2001) (mental health worker who punched
mental patient "in the head four to five times" after the
plaintiff had already been restrained on floor by six other
mental health workers found to have used excessive force).

As explained by the Supreme Court in <u>Hudson</u>, there are
several factors that should be evaluated in determining whether
the use of force was "wanton and unnecessary."  <u>Hudson v.</u>
<u>McMillian</u>, 503 U.S. at 7; <u>see</u> <u>Whitley v. Albers</u>, 475 U.S. 312,
321 (1986).  The extent of the injury suffered by the inmate is
one such factor and "it may also be proper to evaluate the need
for the application of force, the relationship between the need
and the amount of force used, the threat 'reasonably perceived by
the responsible officials,' and 'any efforts made to temper the

severity of a forceful response.'"  Hudson, 503 U.S. at 7

(quoting Whitley, 475 U.S. at 321); accord Cutts v. Dennehy, 2010

WL 1325465, *8 (D.Mass. Mar. 31, 2010).  "From such

considerations inferences may be drawn as to whether the use of

force could plausibly have been thought necessary," or whether

the force was merely inflicted maliciously and sadistically.

Whitley, 475 U.S. at 321.

     The second cause of action in the complaint charges

defendants with using excessive and unnecessary force in

violation of plaintiff's Eighth Amendment rights.  (Docket Entry

# 1).  The determinative issue is whether the force inflicted on

plaintiff was necessary to restore order or whether it was

inflicted maliciously and sadistically.  See Whitley, 475 U.S. at

321.  In making this determination, this court turns to an

analysis of the incident using the five factors detailed above.

     Plaintiff testified that at all times during the alleged

assault he was unarmed and had at least one hand cuffed.  (Docket

Entry # 72, Ex. 1).  Furthermore, plaintiff testified that he was

outnumbered five to one in the cell and was cooperating with the

officers' commands.  (Docket Entry # 72, Ex. 1).  Plaintiff had a

number of superficial cuts on his face and limbs and incurred

significant bruising of the face and head.  (Docket Entry # 72,

Ex. 2).  It is up to the fact finder to determine the extent of

the injury incurred.  Moreover, a lack of serious injury does not

bar a plaintiff from prevailing.  See Hudson, 503 U.S. at 7
(though resulting injuries were deemed minor, blows directed at
the defendant's head which caused bruising, swelling, loosened
teeth and a cracked dental plate, were not *de minimus"* for
Eighth Amendment purposes and thus provided no basis for
dismissal of section 1983 claim).

Defendants, however, testified that plaintiff was forcefully
resisting and thus some application of force was necessary.
(Docket Entry # 69, Ex. C, D, & E).  Defendants testified that
plaintiff was disobeying commands, continuously trying to break
free from the officers control and making threatening remarks.
(Docket Entry # 69, Ex. C).

In short, plaintiff and defendants provide vastly different
factual accounts of the alleged assault.  The facts relevant to
the threshold issue regarding the constitutionality of the use of
force are in dispute.  Summary judgment of the Eighth Amendment
excessive force claim against Murphy, Enos, Harrington, Richards
and Atkinson is thus inappropriate.

B.  McNeil

The complaint does not describe McNeil as participating in
the attack.  "'An officer who is present at the scene and who
fails to take reasonable steps to protect the victim of another
officer's use of excessive force [however] can be held liable
under section 1983 for his nonfeasance.'"  Davis v. Rennie, 264

17

F.3d 86, 98 (1st Cir. 2001) (quoting Gaudreault, 923 F.2d at 207).
A non-participating defendant can only be found liable pursuant
to section 1983 if:  1) "he or she was present when excessive
force was used"; 2) he or she "observed the use of excessive
force"; 3) he or she "was in a position where he or she could
realistically prevent that force"; and 4) he or she "had
sufficient time to do so."  Davis, 264 F. 3d at 102.

Viewing the facts in the light most favorable to plaintiff,
a reasonable jury could find that McNeil was present at the
attack.  At Jahkur's deposition, he testified to witnessing
McNeil exit the cell immediately after the attack on plaintiff.
(Docket Entry # 72, Ex. 3).  Although McNeil was not identified
by plaintiff as one of his attackers, inferences can be drawn
that McNeil was present, either in the cell or standing just
outside the door, when force was used and that he observed the
use of force.  Defendants dispute that McNeil had any involvement
in the alleged assault.  (Docket Entry # 69).

If the use of force is deemed unconstitutional, and it is
proven that McNeil was present at the scene, the key
determination then is whether McNeil was in a position where he
could realistically prevent the force and whether he had
sufficient time to do so.  See Davis, 264 F. 3d at 102.  In
making that determination courts look at the duration of the
attack and the proximity of the officer to the attack.  See

18

<u>Davis</u>, 264 F. 3d at 104 (jury reasonably could have found that the defendants, who were within three feet of the plaintiff's head, had time and opportunity to intervene in attack involving five punches to the plaintiff's head); <u>cf.</u> <u>Gaudreault</u>, 923 F.2d at 207 (the defendants not within direct proximity of the plaintiff had no "realistic opportunity" to prevent attack lasting "a matter of seconds").

Viewing the facts in plaintiff's favor, both McNeil's presence at the scene and the facts regarding his ability to intervene are in genuine dispute. Summary judgment regarding plaintiff's section 1983 claim against McNeil for his failure to intervene is not warranted.

    C. <u>Gouin and Robito</u>

As noted supra, the second cause of action in the complaint charges Gouin and Robito, as well as the other defendants, with violating plaintiff's Eighth Amendment rights. The motion for summary judgment (Docket Entry # 69) submits that plaintiff has not alleged sufficient facts to pass the summary judgment standard. Defendants met their initial burden on summary judgment, however plaintiff fails to address the Eighth Amendment claim relative to Gouin and Robito. Plaintiff therefore fails "to demonstrate that a trier of fact reasonably could find in his favor." <u>Hinchey</u>, 144 F.3d at 140. Summary judgment is therefore warranted with respect to Gouin and Robito on plaintiff's Eighth

Amendment claim against them.

II. <u>Conspiracy Claim</u>

"In order to make out an actionable conspiracy under section 1983, a plaintiff has to prove not only a conspiratorial agreement but also an actual abridgement of some federally-secured right." <u>Nieves v. McSweeney</u>, 241 F.3d 46, 53 (1st Cir. 2001). Furthermore, the plaintiff has the burden to identify the specific constitutional right infringed. <u>Id.</u>

The first cause of action in the complaint alleges that defendants conspired with each other to violate plaintiff's civil rights; specifically, beating plaintiff and then concealing the evidence of their violative actions. (Docket Entry # 1). Having determined that genuinely disputed material facts exist regarding defendants' violation of plaintiff's Eighth Amendment right against cruel and unusual punishment, the issue devolves into whether defendants conspired to violate this right.

Civil conspiracy is "'a combination of two or more persons acting in concert to commit an unlawful act . . . by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages.'" <u>Estate Of Bennett v. Wainwright</u>, 548 F.3d 155, 178 (1st Cir. 2008) (quoting <u>Earle v. Benoit</u>, 850 F.2d 836, 844 (1st Cir. 1988)). To prevail on a claim of conspiracy, plaintiff need not prove an express agreement, but

merely that there is sufficient circumstantial evidence of an agreement to conspire.  <u>Earle</u>, 850 F.2d at 845.

In the present case, the allegation of the existence of a conspiracy presents a genuine issue of material fact.  During the incident, plaintiff testified that he was held down and beaten by five of the defendants, and a sixth defendant was implicated through the deposition of Jahkur.  (Docket Entry # 72, Ex. 1 & 3).  If a jury accepts plaintiff's version of events, it can be inferred that the officers made an express agreement to use excessive force against plaintiff.  This inference is supported by the fact that five officers came to escort plaintiff to his cell, rather than one or two which plaintiff maintains is customary.  (Docket Entry # 72, Ex. 1).  The statement made to plaintiff by Enos as they reached plaintiff's cell, "Amy [Triantafilou] is not doing well," indicates that the officers beat plaintiff in retaliation for plaintiff's striking of a fellow officer (Triantafilou).  (Docket Entry # 72, Ex. 1).

Evidence exists from which a reasonable jury could infer that the officers agreed to conceal the fact that excessive force was applied.  Plaintiff states that after the assault, defendants filed a false and misleading incident report inaccurately stating that plaintiff was non-compliant and resistant during the altercation at issue.  (Docket Entry # 1).

As for Gouin and Robito, who are not named as having been

directly involved in the altercation, each made a statement to
plaintiff immediately after the alleged assault that plaintiff
argues implicates them in the conspiracy to violate his
constitutional rights.  "[C]onspiracy is a matter of inference,
[and] summary judgment may still be appropriate on a conspiracy
claim where the nonmoving party rests merely on conclusory
allegations."  Estate Of Bennett, 548 F.3d at 178 (internal
quotation marks omitted); see Estate Of Benoit, 548 F.3d at 161 &
178 (court found the plaintiffs presented no evidence of
agreement from which reasonable jury could find a conspiracy
where mentally ill man was shot and killed in fire fight with
police officers); cf. Earle, 850 F.2d at 838-839 & 845 (court
found the plaintiff provided sufficient circumstantial evidence
for reasonable jury to infer conspiracy among three troopers who
followed the plaintiff, stopped and searched the plaintiff's
person and vehicle, and arrested the plaintiff several times over
the course of a year).

     In the present case, plaintiff provides sufficient
circumstantial evidence that Gouin was party to an actual
agreement among defendants to conspire to violate plaintiff's
constitutional rights.  After plaintiff was taken to the
infirmary for medical attention, Gouin told plaintiff, "while you
were receiving your beating I was wondering if you would have
survived it, as I was laughing this is a good one, I was glad you

survived I would have regretted doing the paper-work."  The statement indicates that Gouin had contemporaneous knowledge of the assault.  (Docket Entry # 72, Ex. 4, ¶ 15).  Gouin then began patting the officers on the back, stating, "good one," indicating that he approved of the officers' actions.  (Docket Entry # 72, Ex. 4, ¶ 15).  Although Gouin did not directly participate in the alleged assault, from his statements and conduct it can be inferred that he was involved in an agreement to conspire to cover up the unconstitutional assault on plaintiff.

Robito's statement to plaintiff while in the infirmary, "one of mine for one of yous (sic)," however, does not indicate contemporaneous knowledge of the assault.  (Docket Entry # 72, Ex. 1).  His position as Head of Security, without more, does not give rise to the inference of an agreement or knowledge of such an agreement.

In sum, Robito is entitled to summary judgment.  Genuine issues of material fact, however, exist as to an agreement with respect to Gouin, and therefore, summary judgment regarding plaintiff's section 1983 conspiracy claim against Gouin is denied.

III.  <u>Qualified Immunity</u>

In January 2009, the Supreme Court reiterated that qualified immunity is a two step inquiry.  <u>Pearson v. Callahan</u>, __U.S.__, 129 S.Ct. 808, 815-816 (2009); <u>see</u> <u>Maldonado v. Fontanes</u>, 568

F.3d 263, 269 (1st Cir. 2009) (discussing <u>Pearson</u> and adhering to
"the Court's two-part test" thereby abandoning First Circuit's
previously employed three step analysis).  Under this revised
framework, "a court must decide:  (1) whether the facts alleged
or shown by the Plaintiff make out a violation of a
constitutional right; and (2) if so, whether the right was
clearly established at the time of the defendant's alleged
violation."  <u>Estrada v. Rhode Island</u>, 594 F.3d 56, 62-63 (1st Cir.
2010) (internal quotation marks and brackets omitted).  These two
steps "need not be considered in any particular order, and both
prongs must be satisfied for a plaintiff to overcome a qualified
immunity defense."  <u>Raiche v. Pietroski</u>, 623 F.3d 30, 35 (1st Cir.
2010).  The second prong entails ascertaining "the clarity of the
law in general at the time of the alleged violation; and (b) the
clarity of the law as applied to the case-in other words, whether
a reasonable person in the defendant's shoes 'would have
understood that his conduct violated the Plaintiff's
constitutional rights.'"  <u>Raiche v. Pietroski</u>, 623 F.3d at 36.
This prong is also "'highly fact specific.'"  <u>Estrada v. Rhode
Island</u>, 594 F.3d at 63.

Summary judgment relative to the qualified immunity defense
presents a tension because the former "requires absolute
deference to the nonmovant's" facts whereas the latter "demands
deference to the reasonable, if mistaken, actions of the movant."

Morelli v. Webster, 552 F.3d 12, 19 (1st Cir. 2009). Morelli instructs a court "to cabin these standards and keep them logically distinct, first identifying the version of events that best comports with the summary judgment standard and then asking whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." Id.

The version of events that best comports with the summary judgment record is that presented by plaintiff which, notably, is supported by the change in his injuries before and after the assault and the testimony of Nurse Goodwin. The extent of the injuries plaintiff suffered (splits on the forehead and elbow, bruising and swelling on the side of his face as well as a bloody footprint on the side of his face) in relationship to the amount of force reasonably perceived weighs in plaintiff's favor. A reasonable officer also would have understood that beating plaintiff while he was handcuffed with his hands behind his back as well as punching both sides of his face and striking his head against the cement floor when he was not resisting and did not objectively pose a danger to the officers contravened the clearly established law at that time as set out in Hudson and its progeny.

In short, Nurse Goodwin's testimony, the change in plaintiff's injuries before and after the incident and Jahkur's testimony support and lend credence to plaintiff's testimony.

See, e.g., Id. at 20 ("giving credence to the plaintiff's version of events (as the summary judgment standard requires), it is at least arguable that the character of the stop changed in mid-stream"). Given the version of events that best comports with the record, a reasonable officer should have known that his actions were unlawful. Qualified immunity is therefore denied without prejudice at this summary judgment stage. Defendants may renew the defense at trial.

CONCLUSION

_____For the foregoing reasons, defendants' motion for summary judgment (Docket Entry # 68) is **DENIED** except as to: (1) the second cause of action for the violation of plaintiff's Eighth Amendment rights against Gouin and Robito; and (2) the first cause of action for a conspiracy against Robito.

The deadline to file dispositive motions expired nine months ago. Having already allowed defendants leave to file this motion late, there shall be no further extensions of this deadline in this 2007 case. This court will conduct a status conference at 3:00 p.m. on March 24, 2011, to set a trial date.


                                    /s/ Marianne B. Bowler
                              **MARIANNE B. BOWLER**
                              United States Magistrate Judge